**James H. "Jim" BROWN, Commissioner of Insurance for the State of Louisiana as Liquidator of Physician's National Risk Retention Group, Inc.,**

**v.**

**Norman F. SLENKER, et al.**

**No. Civ.A 94–2725–A.**

United States District Court, M.D. Louisiana.

Feb. 1, 1999.

Steven G. Durio, Robert L. Broussard, Durio, McGoffin & Stagg, Lafayette, LA, Honorable Richard Ieyoub, Attorney General for the State of Louisiana, Cassandra Annette Sims, Assistant Attorney General, Mazie LeDeaux Doomes, Assistant Attorney General, Baton Rouge, LA, Frederick H. Kroenke, Jr., Baton Rouge, LA, for plaintiffs.

Michael M. Remson, Robert W. Robison, Watson, Blanche, Wilson & Posner, Baton Rouge, LA, J. Jonathan Schraub, Robins, Kaplan, Miller & Ciresi, Washington, D.C., Paige Ashley Levy, Schraub & Company, McLean, Virginia, for defendants.

## SUPPLEMENTAL REASONS

JOHN V. PARKER, Chief Judge.

This matter came for trial before a jury. At the close of all of the evidence, on January 22, 1999, defendants renewed their motion for judgment as a matter of law under Fed.Rule Civ.P. 50 and that motion was denied for reasons orally assigned. At the same time, the court granted judgment as a matter of law in favor of plaintiff as to the counterclaims based upon fraud and constructive fraud and the defenses of ratification and accord and satisfaction. Finding that there was no legally sufficient evidentiary basis for a reasonable jury to have found for defendants on the malpractice claims asserted by plaintiff, the court granted judgment as a matter of law in favor of plaintiff. The court orally rendered reasons for its ruling, which have been transcribed. (Copy of the transcript is attached as "Attachment A"). The court hereby provides these supplemental reasons.

There is no genuine issue of material fact regarding the following:

1. Physician's National was in the business of insuring medical doctors against medical malpractice claims, including those in Virginia.

2. Physician's National retained Mr. Slenker and his law firm to provide a defense for Dr. Davoudlarian in a medical malpractice lawsuit against him in the state courts of Virginia.

3. Physician's National retained Mr. Slenker and his law firm to provide the same services to numerous other physicians against whom medical malpractice lawsuits had been brought in Virginia.

4. The suit against Dr. Davoudlarian was tried once and resulted in a $10,000 verdict in favor of the plaintiff.

5. The state court trial judge set aside the verdict as to the amount of damages only and ordered a new trial on quantum.

6. That trial resulted in a verdict and judgment in favor of plaintiff in the amount of $1,000,000. Dr. Davoudlarian's policy limits were $500,000.

7. Physician's National, on recommendation of Mr. Slenker decided to appeal the judgment and posted a cash suspensive appeal bond in the amount of $1,175,000.[1]

8. The funds were sent to Mr. Slenker who deposited the funds with the Clerk of Court and performed the legal services necessary to perfect the appeal.

9. Thereafter, Physician's National, a Louisiana corporation, was declared insolvent by a Louisiana state court, which appointed plaintiff, James H. "Jim" Brown, Commissioner of Insurance for the State

---

1. As explained in open court, Physician's National effectively agreed to raise coverage to this amount for purposes of appeal only. Physician's National did not agree, as implied by defendants, to allow Dr. Davoudlarian to use this money as he saw fit. There was no evidence that Physician's National relinquished the right to approve any future settlement of the malpractice action.

of Louisiana, as the Liquidator of the company.

10. Mr. Slenker was notified by Louisiana authorities of the development.

11. Mr. Slenker's law firm performed legal services for the Commissioner, as Liquidator of the company at the request of the Commissioner. Among other services, the law firm filed pleadings on behalf of the Commissioner in a number of pending actions against insureds of Physician's National requesting stays of proceedings because of insolvency and the liquidation proceedings.

12. Mr. Slenker's law firm signed a letter agreement dated July 21, 1992, in which the law firm agreed to act as attorneys for the Commissioner.

13. Although defendants contend that there are disputed issues as to what was intended by this letter agreement there is no dispute that the agreement was signed on behalf of the law firm and that under the law [2] it confirmed a lawyer-client relationship with the Commissioner.

14. The same letter agreement additionally establishes that defendants were aware that the contract and all bills for services would be presented by the Commissioner to the 19th Judicial District Court, Parish of East Baton Rouge, Louisiana, for court approval. Defendants purposefully availed themselves of the benefits of the liquidation proceedings by agreeing to supervision by the Louisiana court and judicial approval of their fees.

15. During this period of time, the Supreme Court of Virginia entered judgment which reversed the judgment of the lower court, vacated that judgment and remanded the case for a new trial on all issues. That was the relief sought by Mr. Slenker in the appeal.

16. On October 15, 1992, Mr. Slenker talked by telephone with one of the Commissioner's Louisiana lawyers, who requested that defendant file the necessary pleadings on behalf of the Commissioner to release the proceeds of the cash appeal bond to him since there no longer was any judgment against Dr. Davoudlarian and

---

**2.** The letter agreement provides in pertinent part: "[W]e wish to advise you that this firm is representing you [Commissioner Brown] in certain matters pending in this jurisdiction in which Physician's National Risk Retention Group in Liquidation has been made a party defendant." The parties agree that, under the laws of Virginia, insurers can only be sued after a judgment has been obtained against the insured. Defendants argue that since the insurer was not actually a party to any of the lawsuits pending in Virginia that they did not represent the Commissioner in any pending matters. This construction would render the quoted provision meaningless. Under Virginia law, it is presumed that the parties have not used words aimlessly and consequently no word or clause is treated as meaningless if a reasonable meaning can be given to it. *Richfood, Inc. v. Jennings*, 255 Va. 588, 499 S.E.2d 272 (Va.1998).

Moreover, the uncontradicted evidence is that Mr. Slenker knew that the Commissioner was laboring under a false impression that Physician's National was a party defendant in all of the lawsuits that defendant's were seeking compensation upon, including the suit against Dr. Davoudlarian. An attorney-client relationship may be implied when a person seeks advice and assistance from an attorney and the attorney fails to clearly set forth his lack of consent to perform the requested services. Under the evidence, there can be no genuine issue of material fact that defendants knew or should have known that the Commissioner was relying upon them for legal assistance as the Liquidator of the company. While there are issues of fact relating to whether Mr. Slenker subsequently attempted to correct the "false" assumptions made by the Commissioner, those issues are simply immaterial. There can be no question that an attorney-client relationship was established under Virginia law. An attorney-client relationship is created when the advice and assistance of the attorney is sought and it is received. *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442 S.E.2d 660 (Va.1994).

Once that relationship was established, Mr. Slenker not only had the duty to clearly terminate that relationship once he discovered a conflict of interest in the Davoudlarian suit, he also would have owed duties to the Commissioner as his former client. As discussed infra, he clearly fell below the applicable standard of care required under the circumstances in any event.

the funds were no longer needed as an appeal bond.

17. During this period of time, Mr. Slenker and the lawyer for the plaintiff in the Davoudlarian action agreed to settle the case for the sum of $700,000 and to fund the settlement by using the funds previously deposited by Physician's National for use as a suspensive appeal bond.

18. Mr. Slenker and the lawyer representing the plaintiff in the Davoudlarian action arranged for a hearing in the Circuit Court of Arlington County on November 5, 1992.

19. The Commissioner was unaware of, and received no notice from Mr. Slenker of the hearing held in Virginia on November 5, 1992, and he never consented to the "settlement" or the use of the bond proceeds to fund it.

20. The Commissioner was not represented at the "hearing" on November 5, 1992 (except by Mr. Slenker).

21. Mr. Slenker did not notify the Commissioner of the "settlement" and use of the appeal bond proceeds to fund it until after the expiration under Virginia law of the appeal delay, when defendant turned over the unused portion of the appeal bond proceeds.

 As the court has ruled in connection with the motion by defendants to dismiss for lack of jurisdiction made at the close of plaintiff's case, the uncontradicted facts establish that defendants purposefully availed themselves of the benefits of the liquidation proceedings. This litigation arises out of that very activity. Even a single act directed at the forum state can be enough to confer personal jurisdiction when the lawsuit arises from or relates to the defendant's contact with the forum state. *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415 (5th Cir.1993). Defendants should have reasonably anticipated being haled into court in Louisiana in connection with their activities related to the liquidation proceedings. As the court has previously found, the assertion of specific personal jurisdiction under the circumstances of this case comports with the minimum requirements inherent in the concept of "fair play and substantial justice".

 As further made evident by the undisputed facts outlined above, there is no question that there was an attorney-client relationship between Mr. Slenker, his law firm and the Commissioner. Not only was a written contract signed, defendant and his firm actually performed legal services on behalf of the Commissioner and took other actions which justifiably led the Commissioner to conclude that Mr. Slenker was acting as his attorney in the Davoudlarian action. Likewise, there can be no question that Mr. Slenker breached his duty of care to the Commissioner by failing to exercise a reasonable degree of care and skill in rendering legal services to the Commissioner as Liquidator.[3]

Mr. Slenker plainly overstepped the bounds of what a reasonable practitioner would do in the representation of one client (Dr. Davoudlarian), having interests adverse[4] to those of another client (the Commissioner).[5] As the attorney hired by

---

**3.** To prevail on his claim for malpractice, the Commissioner had to show that Mr. Slenker failed to exercise reasonable degree of care, skill and dispatch in rendering the services for which he was employed. *Ripper v. Bain*, 253 Va. 197, 482 S.E.2d 832 (Va.1997). After having considered the evidence presented and viewing all reasonable inferences in the light most favorable to defendants, there was insufficient evidence to create a fact question for the jury. A rational jury could not arrive at any verdict other than one for the Commissioner. See, *Burch v. Coca-Cola Co.*, 119

F.3d 305 (5th Cir.1997), cert. denied, ―― U.S. ――, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).

**4.** It should be kept firmly in mind that, until a dispute arose over the proceeds of the cash appeal bond, there was no conflict of interest between the clients and defendants were completely proper in representing the interests of both.

**5.** Defendants presented evidence which raised factual issues relating to whether Mr. Slenker terminated, or at least made some attempts at

Physician's National to defend Dr. Davoudlarian in the malpractice case pending against him in Virginia, the scope of his representation of Dr. Davoudlarian extended only as far as his providing the doctor a legal defense. · He clearly exceeded what a reasonable practitioner would do by causing a settlement to be confected without notification to or approval of the Commissioner, who then admittedly stood in the shoes of the insurance company.

Mr. Slenker further committed a flagrant violation of his fiduciary duties to the Commissioner by participating in the hearing to obtain the release of the appeal bond money and knowingly taking actions to impede the Commissioner's ability to obtain funds that rightfully belonged to the estate of the insurance company. Prior to the hearing, Mr. Slenker had talked by telephone to one of the Commissioner's Louisiana lawyers who specifically requested that Mr. Slenker file the necessary pleadings on behalf of the Commissioner to release the proceeds of the appeal bond.

Instead, without any warning or notification to the Commissioner, Mr. Slenker went to a hearing in a Virginia state court and participated in a proceeding which used $700,000 of the suspensive appeal bond money to fund a "settlement" on behalf of Dr. Davoudlarian. The undisputed facts establish that Mr. Slenker effectively made omissions of material fact with intent to deprive the Commissioner of the opportunity to marshal the assets of the estate of the company in liquidation.

By delivering the balance of the monies (that were not used to settle the malpractice action) to the Commissioner, Mr. Slenker necessarily recognized that the appeal bond money belonged to the estate of the insurance company then under the supervision of the Commissioner. Mr. Slenker acted arbitrarily and without any justification in allowing a portion of those funds to be used to fund the unapproved settlement over the policy limits.

There can be no question that under Virginia law, neither Mr. Slenker, nor Dr. Davoudlarian, nor the plaintiff in his case, nor the lawyer for the plaintiff had any claim of ownership of the bond proceeds after the judgment of the trial court was vacated and set aside by the Supreme Court of Virginia.[6] They nevertheless proceeded to exercise dominion over those proceeds. How they persuaded the Virginia court to place· its blessing upon the scheme is beyond the ken of this court. Since the Commissioner was not a party to that proceeding, its results are not binding upon him and Mr. Slenker, as one of the perpetrators, is liable to the Commissioner for his malpractice.

Nor can there be any question as to whether Mr. Slenker's actions were the proximate cause of damages to the Commissioner, as liquidator of the estate of Physician's National, in the full amount of the monies wrongfully obtained by Mr. Slenker for the benefit of Dr. Davoudlarian. But for defendant's actions, the Commissioner could have retained other counsel and obtained the release of those funds, or at least could have had the opportunity to do so. It cannot be disputed that, had the Commissioner had the opportunity to object, at the November 5, 1992 hearing, the funds could not have been used to fund an unapproved settlement. Consequently, regardless of whether any prejudgment attachment could have issued, if the Commissioner had been afforded notice and an opportunity to represent his interests, defendant would not have been able to cause

---

terminating, any attorney-client relationship he had with the Commissioner prior to the November 5th hearing. This evidence was immaterial inasmuch as Mr. Slenker would have owed essentially the same duties to the Commissioner's as a former client, i.e. not to conceal material facts from him.

6. Those funds stood as security for suspension of execution of the judgment. Code of Virginia § 8.01–676.1.

the funds to be used to settle this single malpractice action against Dr. Davoudlarian alone.[7]

In the context of this litigation, the court finds that plaintiff made a prima facie showing that the estate sustained damages in the amount of $700,000 as a result of defendant's actions. Defendants had the burden of demonstrating that the loss sustained by the Commissioner was less than the amount of money of which he was wrongfully deprived. Defendants failed to present any such evidence. Under the circumstances, the amount of damages was effectively liquidated in the amount of $700,000.

For these reasons as well as those given in open court, the court finds that the Commissioner is entitled to judgment as a matter of law in the amount of $700,000 against both defendants. Judgment will be entered accordingly.

"Attachment A"

JANUARY 22, 1999

(CIVIL ACTION NUMBER 94–2725, JAMES H. BROWN, COMMISSIONER OF INSURANCE FOR THE STATE OF LOUISIANA AS LIQUIDATOR OF PHYSICIAN'S NATIONAL RISK RETENTION GROUP, INC. VERSUS NORMAN F. SLENKER, ET AL; COURT CONVENED AT NINE O'CLOCK A.M.)

REPORTER'S NOTE: (THIS IS A PARTIAL TRANSCRIPT OF THE PROCEEDINGS OF THE ABOVE DATE, AND CONTAINS THE POST TRIAL MOTIONS AND COURT'S EXPLANATION OF RULING)

ALL RIGHT, GET THE JURY.

(JURY SEATED)

THE COURT: MEMBERS OF THE JURY, THE COURT, IN YOUR ABSENCE, HAS DONE SOMETHING UNUSUAL. IT HAS GRANTED WHAT WE CALL JUDGMENT IN FAVOR OF THE PLAINTIFF, MR. BROWN, THE COMMISSIONER, AND AGAINST THE DEFENDANTS, AS A MATTER OF LAW.

NOW, THAT IS BASED UPON A RULE IN OUR PROCEDURES THAT SAYS IF EVERYONE HAS BEEN HEARD, ALL THE EVIDENCE HAS BEEN PRESENTED, AND THE JUDGE CONCLUDES THAT THERE IS NO SATISFACTORY EVIDENTIARY BASIS UPON WHICH A JURY COULD CONCLUDE IN FAVOR FOR OR AGAINST A PARTICULAR ISSUE OR PARTY, THE COURT CAN GRANT A JUDGMENT AS A MATTER OF LAW.

YOU HAVE BEEN HERE, THIS IS GOING INTO THE FOURTH DAY, AND YOU ARE ENTITLED TO KNOW WHY I DID THAT, WHAT ARE MY REASONS FOR DOING THAT, SO THAT IT WINDS UP THAT YOU DO NOT PERFORM YOUR DUTY, WHICH I TOLD YOU WAS TO BE THE JUDGES OF THE FACTS.

DURING THE COURSE OF THIS TRIAL YOU HAVE HEARD A LOT OF INFORMATION AND MISINFORMATION ABOUT A LOT OF THINGS, INCLUDING CONTRACTS, LEGAL MALPRACTICE, LEGAL REPRESENTATION, COURTS, JUDGMENTS, APPEALS, AND ALL SORTS OF THINGS LIKE THAT.

LET ME TELL YOU A LITTLE BIT ABOUT WHAT WE'RE TALKING

---

7. Although not directly relevant here, it is noteworthy that Mr. Slenker also had numerous other clients in state court in Virginia who were insured by Physicians National. He owed each of them the same duty of undivided loyalty as he owed Dr. Davoudlarian (and the Commissioner). Taking **all** of the money for Dr. Davoudlarian's case deprived the other clients of having at least the **opportunity** to ask for an attachment of the funds of the insolvent insurer to help cover claims against them. This court has no idea whether under Virginia law such an attachment would succeed, but the other clients were entitled to the opportunity to try.

ABOUT. AND I'M GOING TO POSE A HYPOTHET, WE CALL IT. THAT'S THE WAY YOU TEACH IN LAW SCHOOL, BY POSING HYPOTHETS, AND THEN ASK THE STUDENTS HOW WOULD THIS CASE COME OUT.

SUPPOSE I COME BY YOUR HOUSE, KNOCK ON THE DOOR, AND YOU COME TO THE DOOR, AND I SAY, I'LL MOW YOUR YARD FOR $15. AND YOU SAY, OKAY. I GO ON OUT THERE AND I MOW THE YARD AND I COME BACK UP, YOU LOOK OUT AND SAY, I'M NOT SATISFIED WITH THE JOB YOU DID. BESIDES THAT, YOU MOWED PART OF MY NEIGHBOR'S YARD AND DIDN'T MOW PART OF MY YARD. I'M NOT GOING TO PAY YOU.

NOW, THAT COLLOQUY OF, I'LL MOW YOUR YARD FOR $15, AND YOU SAY, YES, THAT'S A CONTRACT. IT'S AN ORAL CONTRACT; IT DOESN'T HAVE TO BE IN WRITING. AND IT IS LEGALLY ENFORCEABLE IN COURT. THE ONLY PROBLEM WITH AN ORAL CONTRACT IN COURT IS PROVING IT.

I SAY YOU OWE ME $15, SINCE I'M THE ONE WHO MOWED THE GRASS, AND I'M GOING TO TAKE YOU TO COURT. SO, I TAKE YOU TO CITY COURT OVER HERE, WHERE YOU CAN BE YOUR OWN LAWYER. AND I ACT AS MY LAWYER, AND YOU ACT AS YOUR LAWYER.

THE CITY COURT HEARS ME AND SAYS, YOU'RE ABSOLUTELY RIGHT, YOU MOWED THE GRASS. YOU DIDN'T DO A VERY GOOD JOB, BUT YOU DID A GOOD ENOUGH JOB TO GET $15, AND I HEREBY RENDER JUDGMENT IN FAVOR OF YOU.

NOW, WHAT IS A JUDGMENT? A JUDGMENT IS NOTHING BUT A COURT ORDER THAT DIRECTS SOMEBODY TO PAY SOMEBODY ELSE SOME MONEY. THAT'S A MONEY JUDGMENT. THERE ARE OTHER KINDS OF JUDGMENTS, BUT WE'RE TALKING ABOUT A MONEY JUDGMENT HERE. SO, I ORDER YOU TO PAY JOHN PARKER $15 THAT YOU OWE HIM.

AND YOU SAY, WELL, YOU KNOW, THAT ISN'T RIGHT. I DON'T OWE THAT $15. HE DIDN'T DO THE GOOD KIND OF JOB HE SHOULD HAVE. I WANT TO GET TO ANOTHER COURT. AND THE JUDGE DOWN THERE SAYS, WELL, YOU CAN APPEAL MY JUDGMENT, BUT YOU HAVE TO POST AN APPEAL BOND IF YOU DO. AND YOU SAY, HOW MUCH IS THAT GOING TO COST ME?

HE SAYS, WELL, AN APPEAL LIKE THIS, YOU WOULD GO TO THE DISTRICT COURT, WHICH IS JUST ACROSS THE STREET FROM THE CITY COURT, AND THE BOND WOULD BE IN THE AMOUNT OF $20. IT WOULD BE MORE THAN WHAT THE AMOUNT OF THE JUDGMENT IS.

SO, YOU POST $20 FOR AN APPEAL BOND. YOU HAD TO BORROW THE MONEY, BUT YOU POSTED AN APPEAL BOND. YOU DO THAT BY GIVING IT TO THE CLERK OF THE COURT WHO HOLDS THE MONEY WHILE YOU TAKE YOUR APPEAL.

NOW, THE PURPOSE OF THAT $20 APPEAL BOND IS TO PAY THE JUDGMENT IF THE $15 JUDGMENT IS AFFIRMED BY THE DISTRICT COURT ACROSS THE STREET. IN OTHER WORDS, IF I STILL WIN IN THE UPPER COURT, AND THE HIGHER COURT SAYS THAT JUDGMENT IS AFFIRMED, THAT MONEY IS THERE TO BE SURE THAT THAT JUDGMENT CAN BE PAID.

THE REASON THE LAW PROVIDES FOR THAT IS THAT WHEN YOU TAKE AN APPEAL AND POST THAT BOND, THAT'S WHAT IS CALLED SUSPENDING THE EXECUTION OF

THE JUDGMENT. THAT MEANS YOU HAVE A JUDGMENT, BUT YOU CAN'T ENFORCE IT. AND BECAUSE YOU DON'T GET YOUR MONEY WHEN YOU'RE SUPPOSED TO, YOU HAVE TO PUT UP MORE MONEY TO COVER INTEREST AND THAT SORT OF THING. THAT'S WHY IT'S MORE THAN JUST THE $15. IT'S $20.

NOW, IF THE DISTRICT COURT AFFIRMS THE JUDGMENT, THEN I CAN GO BACK TO THE CITY COURT AND GET MY MONEY BACK FROM THE CLERK OF COURT, BECAUSE THAT'S THE PURPOSE OF THE APPEAL BOND.

IF THE DISTRICT COURT SAYS, WELL, THE CITY COURT IS WRONG, YOU DON'T OWE THAT MONEY, THE JUDGMENT IS HEREBY REVERSED, AND THE JUDGEMENT IS VACATED AND SET ASIDE, THERE NO LONGER IS ANY JUDGMENT, AND WE REMAND IT FOR A NEW TRIAL.

SO, YOU START ALL OVER. I DO, BECAUSE I'M THE ONE ASKING FOR THE MONEY. THERE IS NO JUDGMENT. IN ORDER TO GET THE MONEY, I'VE GOT TO GO BACK TO COURT AND GET ANOTHER JUDGMENT. I'VE GOT TO WIN AGAIN, IN OTHER WORDS.

NOW, UNDER SOME CIRCUMSTANCES, THE CITY COURT MAY SAY, WELL, YOU'RE NOT VERY WELL OFF FINANCIALLY; YOU KIND OF FLY BY NIGHT. I'M GOING TO HOLD THE MONEY UNTIL THE OUTCOME OF THE TRIAL, JUST IN CASE JOHN PARKER WINS AGAIN, AND THEY MIGHT BE ABLE TO DO THAT.

BUT, ORDINARILY, YOU WOULD BE ENTITLED, UNDER THE LAW, TO GO GET YOUR $20 BACK AS SOON AS THE HIGHER COURT SAYS JUDGMENT IS HEREBY VACATED AND SET ASIDE.

NOW, THAT JUDGMENT, IN THAT HYPOTHET, IS NO DIFFERENT IN LAW AND SUBSTANCE THAN THE $1 MILLION JUDGMENT THAT WAS INVOLVED IN THIS CASE. THERE WAS A JUDGMENT RENDERED AGAINST DR. DAVOUDLARIAN, WHICH PHYSICIAN'S NATIONAL RISK RETENTION GROUP WAS OBLIGATED TO PAY, BECAUSE THE DOCTOR HAD INSURANCE.

WE HAVEN'T TALKED ABOUT INSURANCE YET. WE'RE GOING TO GET INTO THAT. BUT PHYSICIAN'S NATIONAL RISK RETENTION GROUP WAS OBLIGATED TO PAY THAT JUDGMENT. WHY? BECAUSE THEY TOOK MONEY FROM THE DOCTOR; HE PAID THEM A PREMIUM AND THEY ISSUED HIM AN INSURANCE POLICY.

AS THESE LAWYERS HAVE TALKED ABOUT ALL WEEK, THEY ARE OBLIGATED TO PROTECT DR. DAVOUDLARIAN'S INTEREST. SO, THEY DECIDED TO ENTER AN APPEAL AND TO POST AN APPEAL BOND, WHICH IS THE EQUIVALENT OF THE $20 THAT I WAS TALKING TO YOU ABOUT, EXCEPT IT'S A MILLION DOLLARS, MILLION–ONE–HUNDRED–SEVENTY–FIVE–THOUSAND.

I DON'T KNOW WHAT THE EXACT AMOUNT IS, AND, OF COURSE, THERE IS A LOT OF DIFFERENCE BETWEEN $20 AND A MILLION DOLLARS, BUT THERE IS NO DIFFERENCE IN PRINCIPLE BETWEEN $20 AND $1 MILLION. AND THERE IS NO DIFFERENCE IN WHAT THE PURPOSE OF THE MONEY IS.

THE PURPOSE, AND THE ONLY PURPOSE, UNDER LOUISIANA LAW, AND UNDER VIRGINIA LAW, AND I HAVE THE VIRGINIA LAW RIGHT HERE IN FRONT OF ME, IS, NUMBER ONE, SUSPEND THE JUDGMENT SO IT CAN'T BE EXECUTED UNTIL A HIGHER COURT ACTS ON

IT, AND, NUMBER TWO, TO GUARANTEE PAYMENT OF THE JUDGMENT. IT DOESN'T GUARANTEE PAYMENT OF ANYTHING ELSE. IT GUARANTEES PAYMENT OF A JUDGMENT.

NOW, WHEN PHYSICIAN'S NATIONAL RISK RETENTION GROUP ISSUED THIS POLICY OF INSURANCE TO THIS DOCTOR, IT INCURRED A NUMBER OF OBLIGATIONS. ONE OF THE OBLIGATIONS IS WHAT WE CALL THE DUTY TO DEFEND. THE OTHER OBLIGATION THAT IT HAS IS TO PAY, WHICH WE CALL INDEMNITY AGREEMENT.

SO, THIS INSURANCE COMPANY AND ANY OTHER INSURANCE COMPANY UNDER A SIMILAR TYPE CIRCUMSTANCE, OWES TWO DUTIES TO A PERSON WHO IS INSURED. THE FIRST IS THE DUTY TO DEFEND LAWSUITS, NOT ANYTHING ELSE. THE DUTY TO DEFEND LAWSUITS THAT ARE BROUGHT AGAINST THE PERSON INSURED. AND THAT DUTY IS TO DEFEND THOSE LAWSUITS WITHOUT REGARD TO WHETHER THEY ARE TRUE.

IN OTHER WORDS, THE COMPANY IS REQUIRED TO DEFEND LAWSUITS THAT ARE FALSE, AS WELL AS LAWSUITS THAT ARE GOOD. AND THEN IF THE COMPANY LOSES, THE COMPANY—AND I'LL QUOTE FROM THE POLICY—"WILL PAY ON BEHALF OF THE INSURED, ALL SUMS WHICH THE INSURED SHALL BECOME LEGALLY OBLIGATED TO PAY AS DAMAGES UNDER A JUDGMENT OF A COURT."

NOW, AN INSURANCE COMPANY DOESN'T HAVE ANY OBLIGATION TO PAY ANYTHING ELSE EXCEPT A JUDGMENT AFTER A TRIAL HAS BEEN CONDUCTED, AND YOU LOSE.

NOW, IT IS UNDISPUTED THAT THIS INSURANCE COMPANY, ACTING THROUGH ITS REPRESENTATIVES, CONTACTED MR. SLENKER, ONE OF THE DEFENDANTS, AND ASKED HIM TO DEFEND DR. DAVOUDLARIAN ON THIS LAWSUIT.

ACTUALLY, I THINK THEY TALKED TO HIM ABOUT IT BEFORE IT WAS ACTUALLY A LAWSUIT, BUT THE DUTY TO DEFEND ARISES WHEN THE LAWSUIT IS FILED. BECAUSE IF YOU DON'T HAVE A LAWSUIT, YOU DON'T HAVE A DUTY TO DEFEND. THAT ISN'T HARD TO UNDERSTAND.

THERE HAS BEEN A LOT OF TALK HERE ABOUT LAWYERS' OBLIGATIONS. AND THERE IS NO QUESTION BUT THAT MR. SLENKER HAD AN ABSOLUTE, PERFECTLY CLEAR, NON–DELEGATABLE DUTY TO DR. DAVOUDLARIAN TO DEFEND HIM IN COURT, WITH ALL OF HIS SKILL, RESOURCES, AND ABILITY, AND COMPLETE DEVOTION TO DR. DAVOUDLARIAN INSOFAR AS THE DEFENSE OF THIS LAWSUIT IS CONCERNED.

THE INSURANCE COMPANY IS NOT REQUIRED TO, AND DOES NOT HIRE MR. SLENKER TO ACT AS DR. DAVOUDLARIAN'S GENERAL LAWYER ON ALL MATTERS. MR. SLENKER IS DR. DAVOUDLARIAN'S LAWYER FOR A LIMITED PURPOSE. THAT PURPOSE IS TO DEFEND THE LAWSUIT, AND MR. SLENKER APPARENTLY DID IT VERY WELL.

THE FIRST TIME THEY WENT TO TRIAL, HE LOST ON THE LIABILITY BUSINESS, BUT HE KEPT THE DAMAGES DOWN TO ONLY $10,000, WHICH THE LAWYER FOR THE PLAINTIFF—AND

I CAN'T REMEMBER HIS NAME RIGHT NOW—HE GOT THE COURT DOWN THERE TO SET THAT VERDICT ASIDE AND HAVE ANOTHER TRIAL JUST ON THE QUESTION OF HOW MUCH MONEY IS THIS PLAIN-

TIFF, THIS LADY, ENTITLED TO COLLECT.

AND I AGREE WITH MR. SLENKER; THAT PUT THE DEFENDANT DOCTOR IN A TERRIBLE POSITION. BECAUSE HE WAS NOT ALLOWED, AT THAT TIME, TO TRY TO ARGUE THAT THERE ISN'T ANY LIABILITY AT ALL. I DON'T OWE THIS LADY ANYTHING; IT'S JUST A QUESTION OF HOW MUCH SHE'S GOING TO TAKE HOME. AND, AS YOU KNOW, IT CAME OUT TO BE A MILLION DOLLARS.

AND HIS COVERAGE, AS YOU KNOW, WAS ONLY $500,000, BUT THE COMPANY SAID, WE THINK THIS WAS SUCH A MISCARRIAGE OF JUSTICE THAT WE WANT TO APPEAL THIS DECISION, AND WE ARE GOING TO INCREASE DR. DAVOUDLARIAN'S COVERAGE FROM $500,000 TO A MILLION SO THAT HE WON'T HAVE ANY PERSONAL EXPOSURE ON THIS APPEAL.

SO, THEY PUT UP $1 MILLION IN CASH AND ASKED MR. SLENKER TO DELIVER IT TO THE CLERK OF COURT. AND TO PERFECT THE BOND, YOU'VE GOT TO SIGN SOME PAPERS AND STUFF TO ENTER THE APPEAL AND GET THE MONEY EARMARKED TO BE THIS PARTICULAR CASE AND FOR THIS PARTICULAR APPEAL.

AND THE PURPOSE OF THAT BOND WAS THE SAME AS THE $20 WE WERE TALKING ABOUT. THAT WAS IN CASE MR. SLENKER LOST THE APPEAL AND THE HIGH COURT SAID JUDGMENT AFFIRMED, THE $1 MILLION WOULD BE THERE TO PAY THE JUDGMENT. AND IT'S THERE FOR NO OTHER PURPOSE THAN TO PAY A JUDGMENT.

BUT, LO AND BEHOLD, THE HIGHER COURT SAID, NOPE, THE LOWER COURT WAS WRONG ON ALL COUNTS. THE LOWER COURT WAS WRONG IN FINDING THAT THERE WAS LIABILITY IN THE FIRST PLACE, AND THE LOWER COURT WAS WRONG IN THE AMOUNT OF DAMAGES, SO WE REVERSE AND VACATE THE JUDGMENT OF THE LOWER COURT AND REMAND IT FOR ANOTHER TRIAL. MR. SLENKER WAS SUCCESSFUL IN THE SUPREME COURT OF VIRGINIA.

NOW, WHEN THEY REMANDED THAT, THEY DID JUST LIKE MY LITTLE HYPOTHET IN THE CITY COURT. THEY REMANDED IT FOR ANOTHER TRIAL. THERE HAS BEEN A LOT OF TALK BACK AND FORTH IN THIS COURTROOM ABOUT WHETHER OR NOT THE COMMISSIONER WAS ENTITLED TO GET THAT MONEY BACK, BECAUSE, AS YOU KNOW, AFTER PHYSICIAN'S NATIONAL RISK RETENTION GROUP PUT UP THE MONEY, THE COMPANY WENT WHAT I CALL BELLY-UP; IT WAS INSOLVENT.

IT WAS TAKEN OVER BY A LOUISIANA COURT. AND THE COMMISSIONER WAS ORDERED BY THE COURT TO LIQUIDATE IT. AND HE'S GOT CERTAIN DUTIES AND RESPONSIBILITIES IN CONNECTION WITH THAT LIQUIDATION.

THE FIRST DUTY AND RESPONSIBILITY THE COMMISSIONER HAS UNDER THE LAW IS TO MARSHAL, COLLECT, FIND ALL OF THE ASSETS OF THE COMPANY. AND IT IS VERY SIMILAR TO BANKRUPTCY. I TOLD YOU THE OTHER DAY, INSURANCE COMPANIES DON'T GO BANKRUPT; THEY HAVE TO FOLLOW A DIFFERENT PROCEDURE. AND YOU MIGHT SAY WHY. I CAN'T TELL YOU WHY, OTHER THAN THAT IS WHAT THE LAW SAYS. THAT'S THE WAY THE CONGRESS AND THE LEGISLATURES OF THE VARIOUS STATES HAVE DONE.

BUT THE INSURANCE COMMISSIONER STEPS INTO THE SHOES OF THE COMPANY, TAKES OVER ALL OF THE COMPANY'S ASSETS, AND IS THE BENEFICIARY OF ALL OBLIGATIONS OWED UNDER ALL CONTRACTS PREVIOUSLY ENGAGED IN BY THE INSURANCE COMPANY.

BUT BECAUSE THIS IS SIMILAR TO BANKRUPTCY, THE COMMISSIONER IS NOT NECESSARILY BOUND TO FULFILL ALL OF THE CONTRACTS AND OBLIGATIONS THAT THE COMPANY HAD UNDERTAKEN BEFORE IT WAS PLACED INTO LIQUIDATION.

IF YOU THINK ABOUT THAT, THAT'S OBVIOUS. IT HAS TO BE THAT WAY, BECAUSE THE COMPANY NOW CAN'T PAY ALL OF ITS OBLIGATIONS BECAUSE IT'S INSOLVENT. IT DOESN'T HAVE ENOUGH ASSETS. SO, FOR THAT REASON, THE LAW SAYS THE COMMISSIONER WILL GET ALL OF THE ASSETS TOGETHER, COLLECT THEM, FIND THEM WHEREVER THEY ARE, AND THEN HE WILL PAY AS MANY CLAIMS AS HE CAN, ACCORDING TO THE LAW, AND AS PRIORITY, WHO GETS PAID FIRST AND ALL THIS KIND OF STUFF.

YOU TRY TO PAY ALL OF THEM, BUT UNLESS THERE IS ENOUGH ASSETS, HE CAN'T PAY ALL OF THEM. SO, THAT'S WHAT THIS COMMISSIONER WAS DOING DURING THE COURSE OF THESE PROCEEDINGS. HE WAS TRYING TO COLLECT ALL OF THE ASSETS.

THERE HAS BEEN SOME EVIDENCE THAT THEY DIDN'T DO A VERY GOOD JOB SOMETIMES. THAT'S GOT NOTHING TO DO WITH IT. HIS DUTY IS TO COLLECT ALL OF THE ASSETS.

NOW, WHEN THE SUPREME COURT OF VIRGINIA VACATED THE JUDGMENT AND SET IT ASIDE, IT CREATED A POTENTIAL PROBLEM, IF THE COMMISSIONER SAID GET THE MONEY BACK.

PROBLEM? YES, BECAUSE DR. DAVOUDLARIAN WANTED TO MAKE SURE THAT IF HE WENT TO TRIAL AGAIN AND LOST AGAIN, THAT MONEY WOULD BE AVAILABLE TO PAY ANY JUDGMENT THAT WAS RENDERED AGAINST HIM.

THE COMMISSIONER OF INSURANCE, HOWEVER, IS CHARGED WITH DETERMINING A FAIR MANNER OF SPREADING THE ASSETS TO COVER AS MANY CLAIMS AS POSSIBLE. AND IF THE INSURANCE COMMISSIONER GETS ALL OF THE MONEY TOGETHER AND HE REALIZES THAT DR. DAVOUDLARIAN WENT BACK TO ANOTHER TRIAL, AND MR. SLENKER DID THE BEST HE COULD, HE GAVE HIM HIS UNDIVIDED LOYALTY AND UNDIVIDED ATTENTION, AND THE BEST SKILL HE HAD, AND HE STILL LOST, AND IF THERE IS A JUDGMENT FOR A MILLION DOLLARS AGAINST HIM AGAIN, THAT BOND WOULD BE AVAILABLE TO PAY THE MILLION DOLLARS, IF THEY CAN KEEP IT IN VIRGINIA AND KEEP IT IN THE VIRGINIA COURTHOUSE.

NOW, THERE HAS BEEN A LOT OF TALK HERE ABOUT WHO WAS BEING THE LAWYER FOR WHO, AT WHAT TIME AND UNDER WHAT CIRCUMSTANCES. THERE IS NO QUESTION BUT THAT THE INSURANCE COMPANY HIRED MR. SLENKER TO BE THE LAWYER FOR THE DOCTOR. AND I'VE SAID A COUPLE OF TIMES ALREADY THAT THAT IMPOSED ON HIM, UNDER THE LAW, THE DUTY OF ABSOLUTE DEVOTION TO HIS INTEREST. BUT NOT TO ALL OF HIS INTERESTS. HIS INTEREST IN DEFENDING THIS LAWSUIT AND ONLY THIS LAWSUIT.

AT SOME STAGE OF THE PRO-CEEDINGS, MR. SLENKER'S FIRM WAS NOTIFIED ABOUT THIS INSOLVENCY AND ABOUT THE COMMISSIONER TAKING OVER AND ALL THIS SORT OF THING. THE EVIDENCE IS UNDISPUTED, AND YOU COULD NOT FIND TO THE CONTRARY IF I SUBMITTED THE CASE TO YOU, THAT MR. SLENKER'S FIRM DID ACT AS THE COMMISSIONER'S LAWYER. MR. SLENKER DID ACCEPT THE COMMISSIONER AS A SECOND CLIENT. AND THERE IS NO PROBLEM IN SO DOING.

AND I WOULD AGREE WITH THE TESTIMONY OF MR. MILLER, WHO WAS BROUGHT HERE TODAY BY THE DEFENSE; THAT UNDER VIRGINIA LAW AND UNDER LOUISIANA LAW, AND ALMOST EVERYWHERE, THERE IS NO ETHICAL OR OTHER PROBLEM IN A LAWYER HAVING MORE THAN ONE CLIENT.

NOW, A LAWYER DOESN'T HAVE TO HAVE MORE THAN ONE CLIENT, BUT HE CERTAINLY MAY, IF HE WISHES, ACCEPT MORE THAN ONE CLIENT, EVEN WHERE ONE OF THE CLIENTS IS AN INSURED PERSON UNDER AN INSURANCE POLICY AND THE OTHER CLIENT IS THE INSURANCE COMPANY WHO ISSUED THE POLICY. AND CERTAINLY, BOTH CLIENTS HAVE TO GO ALONG WITH THAT.

BUT THERE IS NO PROBLEM WITH IT, LEGALLY, ETHICALLY, OR ANYTHING ELSE. AND THE LAWYER OWES THE SAME DUTY OF FIDELITY AND LOYALTY TO BOTH CLIENTS WHEN HE ACCEPTS THAT REPRESENTATION. AGAIN, IT'S NOT AN AGREEMENT TO BE THE LAWYER FOR ALL PURPOSES, BUT IT'S TO BE THE LAWYER FOR WHATEVER PURPOSE IT IS THAT IS SPECIFIED.

IN THIS CASE, IT WAS AN AGREEMENT TO BE THE LAWYER FOR THE COMMISSIONER OF INSURANCE, AT LEAST IN FILING SOME MOTIONS FOR STAY ORDERS AND THAT SORT OF THING IN CASES IN VIRGINIA, AND MR. SLENKER'S FIRM DID THAT. DID IT SUCCESSFULLY ON SOME OF THEM, I UNDERSTAND. THAT IS ACTING AS A LAWYER FOR THE COMMISSIONER.

AND YOU DON'T HAVE TO HAVE ANY BIG WRITTEN CONTRACT BEING A LAWYER FOR SOMEBODY. I TOLD YOU ABOUT MY ORAL CONTRACT TO MOW THE GRASS. AN ORAL CONTRACT TO BE A LAWYER IS JUST AS MUCH A CONTRACT AS THE CONTRACT TO MOW THE GRASS.

SO, AT THAT POINT, UNDER THE LAW, MR. SLENKER HAD OBLIGATIONS TO BOTH CLIENTS. AGAIN, REMEMBER, HE DIDN'T AGREE TO BE EITHER ONE OF THEM'S LAWYER FOR ANYTHING AND EVERYTHING THAT MIGHT COME UP. SO, WHEN HE HAD HIS CONVERSATION WITH MR. MCCOLLISTER—AND WE'VE HEARD A LOT OF TALK ABOUT THAT, BOTH FROM MR. MCCOLLISTER AND MR. SLENKER.

MR. MCCOLLISTER, ACCORDING TO MR. SLENKER, ASKED HIM TO DO SOMETHING HE WASN'T GOING TO DO. AND THAT WAS TO REPRESENT THE COMMISSIONER TO TRY TO GET THE MONEY THAT WAS SERVING AS A GUARANTEE FOR PAYMENT OF ANY JUDGMENT THAT MIGHT BE RENDERED.

REMEMBER, THERE IS NO JUDGMENT AT THIS TIME. THE CASE HAD BEEN ORDERED FOR ANOTHER TRIAL, BUT IT HASN'T BEEN HAD YET. SO, THAT WAS A GUARANTEE IF THEY WENT TO COURT AND LOST AND THE JUDGMENT WAS RENDERED. AND IN HIS MIND, HE

SAID THAT THAT WOULD HURT MY CLIENT, AND I AM JUST NOT GOING TO DO THAT. AND HE IS FULLY ENTITLED TO SAY THAT, BECAUSE YOU DON'T HAVE TO DO EVERYTHING A CLIENT WOULD LIKE YOU TO DO. BUT YOU DO HAVE TO TELL THE CLIENT I'M NOT GOING TO DO IT.

NOW, THERE IS AN ARGUMENT ABOUT WHETHER MR. SLENKER MADE IT CLEAR TO MR. MCCOLLISTER THAT I'M NOT GOING TO DO IT, UNDER NO CIRCUMSTANCES WILL I DO IT, OR WHETHER MR. MCCOLLISTER WAS TOLD, I WILL LOOK INTO IT AND LET YOU KNOW WHERE I AM. ACCORDING TO MR. SLENKER'S NOTES, HE TOLD HIM, I CAN'T PUT MYSELF IN THE MIDDLE OF THAT FIGHT.

NOW, THAT WOULD BE A QUESTION OF FACT THAT YOU WOULD HAVE TO RESOLVE, BUT IT REALLY DOESN'T MATTER. IT'S REALLY IRRELEVANT. I WANT YOU TO UNDERSTAND, MR. SLENKER HAD EVERY LEGAL AND MORAL AND ETHICAL RIGHT TO REFUSE TO DO THAT IF HE DIDN'T WANT TO DO IT. BUT HE DID HAVE THE OBLIGATION TO MAKE IT CLEAR THAT HE WASN'T GOING TO DO IT.

MR. SLENKER HAD A DUTY TO THE INSURANCE COMPANY, OR THE COMMISSIONER STANDING IN THE SHOES OF THE INSURANCE COMPANY, THAT HE HAD AGREED TO REPRESENT, THAT HE WAS REPRESENTING AT THE TIME. AND, OF COURSE, HE DID SIGN AN AGREEMENT THAT HE WOULD REPRESENT THE INSURANCE COMPANY. AND THERE HAS BEEN A LOT OF ARGUMENT BACK AND FORTH ABOUT IT, AS TO JUST WHAT THE ENGAGEMENT INVOLVED.

WELL, IT IS CERTAINLY NOT CLEAR AS TO WHAT MR. SLENKER WAS BEING HIRED TO DO, BUT I WOULD NOT LET YOU FIND TO THE CONTRARY, THAT HE WAS NOT HIRED AT ALL UNDER THIS DOCUMENT DATED JULY 21, 1992, JOINT EXHIBIT 13. HE CERTAINLY ACCEPTED THE COMMISSIONER AS A CLIENT.

HE SAID IT WAS BY DURESS; THEY WOULDN'T PAY ME IF I DIDN'T SIGN THE CONTRACT. WELL, THAT'S NOT UNUSUAL. LOTS OF PEOPLE AREN'T GOING TO PAY YOU IF YOU DON'T SIGN THE CONTRACT. AND THE COMMISSIONER HAD A LEGAL OBLIGATION TO HAVE A SIGNED CONTRACT THAT HE COULD PRESENT TO THE COURT, THAT WAS SUPERVISING WHAT THE COMMISSIONER DID. SIGNING THE CONTRACT IS NOT AN UNREASONABLE REQUIREMENT.

SO, I WOULD NOT LET YOU MAKE A FINDING THAT MR. SLENKER WAS NEVER HIRED AS A LAWYER BY THE COMMISSIONER.

NOW, UP UNTIL THAT POINT, NOTHING HAD OCCURRED WHICH WOULD, IN ANY WAY, INTERFERE WITH MR. SLENKER LEGALLY, ETHICALLY, AND MORALLY REPRESENTING BOTH THE INSURANCE COMPANY, OR THE COMMISSIONER AND DR. DAVOUDLARIAN, BECAUSE THEY BOTH HAD THE SAME OBJECTIVE, WHICH WAS TO DEFEAT THAT LAWSUIT, TO WIN THE TRIAL THAT WAS COMING UP IN TWO OR THREE MONTHS. THOSE INTERESTS ARE EXACTLY THE SAME.

NOW, I'VE TOLD YOU MR. SLENKER DIDN'T HAVE ANY DUTY TO ACT ON BEHALF OF THE COMPANY AS THEIR LAWYER AND MOVE TO WITHDRAW THE FUNDS AND TAKE THEM BACK TO LOUISIANA WHERE THEY WOULD BECOME PART OF A BIG MELTING POT, AND DR. DA-

VOUDLARIAN'S JUDGMENT, IF IT WENT AGAINST HIM AGAIN, AND IF IT WAS STILL A MILLION DOLLARS, HE MIGHT NOT GET PAID THE WHOLE MILLION DOLLARS. HE DIDN'T HAVE A DUTY TO DO THAT.

BUT YOU KNOW WHAT HE DID HAVE A DUTY TO DO? HE HAD A DUTY TO LEAVE THE MONEY ALONE. HE DID GET MIXED UP IN THAT FIGHT, AS HE SAID HE TOLD MR. MCCOLLISTER HE COULDN'T AND WOULDN'T, BECAUSE HE WENT ON DR. DAVOUDLARIAN'S SIDE TO GET THE MONEY. IT WASN'T DR. DAVOUDLARIAN'S MON-EY. IT WASN'T MR. SLENKER'S MONEY. IT WASN'T THE OTHER LAWYER'S MONEY, IT WASN'T THE COURT'S MONEY, IN VIRGINIA. IT WAS MONEY POSTED TO PAY A JUDGMENT IF THERE WAS A JUDG-MENT, AND IN THIS CASE, THERE WAS NO JUDGMENT.

SO, WHAT MR. SLENKER DID, AS A VIOLATION OF HIS LEGAL DUTY TO HIS CLIENT, THE COMMISSIONER, WAS TO PARTICIPATE IN REMOVAL OF THE MONEY WITHOUT THE PER-MISSION AND CONSENT OF THE COMMISSIONER, TO WHOM IT WAS RIGHTFULLY DUE.

THERE ARE ONLY TWO PEOPLE WHO WOULD EVER HAVE A CLAIM AGAINST THAT MONEY. TWO PEO-PLE, ENTITIES. ONE WOULD BE THE LADY THAT SUED THE DOC-TOR—AND I CAN'T REMEMBER HER NAME RIGHT NOW, BUT YOU KNOW THE LADY I'M TALKING ABOUT—IF SHE HAD A RETRIAL AND WON AND GOT A JUDGMENT, SHE WOULD HAVE A CLAIM ON THAT MONEY IN A NEW YORK SECOND.

BUT IF SHE LOST THE RETRIAL, AND JUDGMENT WAS RENDERED IN FAVOR OF THE DOCTOR, THE MONEY WOULD GO BACK TO WHO-EVER PUT IT UP, WHICH, IN THIS CASE, WOULD BE THE COMMIS-SIONER, AS SUCCESSOR OF AND ACTING FOR PHYSICIAN'S NATION-AL RISK RETENTION GROUP, BE-CAUSE PHYSICIAN'S NATIONAL RISK RETENTION GROUP PUT THE MONEY UP. NOBODY ELSE HAD ANY CLAIM AGAINST THAT MONEY.

NOW, IT'S CERTAINLY CONCEIVA-BLE, ALTHOUGH I DIDN'T STUDY THIS PART OF VIRGINIA LAW, THAT VIRGINIA COULD HAVE A LAW THAT SAYS WHERE YOU HAVE AN INSOLVENT INSURANCE COMPANY AND THEY HAVE MONEY HERE IN VIRGINIA, WE'RE GOING TO SEIZE THAT MONEY AND HOLD IT UNTIL THE OUTCOME OF A TRIAL.

I DON'T KNOW IF THEY HAVE ANY LAW LIKE THAT, OR NOT. BUT IT CERTAINLY MIGHT BE THAT WAY. IF IT IS, AND IF THE COURT IN VIRGINIA ISSUED AN ORDER, HOLD THAT MONEY UNTIL THIS TRIAL IS COMPLETED, THAT WOULDN'T HURT THE COMMIS-SIONER, OTHER THAN HE WOULDN'T HAVE THE MONEY RIGHT THEN. BUT THAT, YOU SEE, IS THE WAY THIS SHOULD HAVE BEEN HANDLED.

IF IT WAS GOING TO BE HELD IN VIRGINIA, TO GUARANTEE PAY-MENT OF A JUDGMENT, IF THERE WAS A JUDGMENT, THEN IT SHOULD HAVE BEEN BY A COURT PROCEEDING TO HOLD THE MON-EY. AND THAT WOULD HAVE FUL-LY PROTECTED THE DOCTOR, IF THAT WAS DONE. AND THAT'S WHERE MR. SLENKER GOT MIXED UP ON HIS DUTIES. HE DIDN'T HAVE TO WITHDRAW THE MONEY OR HELP THE COMPANY WITH-DRAW THE MONEY. AND IT WOULDN'T NECESSARILY BE A VIO-LATION OF HIS DUTY TO THE DOC-TOR TO DO THAT.

UNDER SOME CIRCUMSTANCES, THEY COULD HAVE HAD A JOINT INTEREST IN THAT. THEY COULD HAVE HAD A JOINT INTEREST, IF THE DOCTOR HAD WORKED OUT, WITH THE COMMISSIONER, SOME SATISFACTORY METHOD OF GUARANTEEING PAYMENT OF THE JUDGMENT IF THEY WENT BACK TO TRIAL AGAIN.

BUT, YOU SEE, THE COMMISSIONER DIDN'T HAVE THAT OPPORTUNITY, BECAUSE THE COMMISSIONER DIDN'T KNOW THAT THEY WERE GOING TO GO TO COURT AND ASK THE COURT TO LET THEM USE THIS MILLION DOLLARS TO PAY A SETTLEMENT THAT THE COMMISSIONER DID NOT PARTICIPATE IN, DID NOT KNOW ABOUT.

THAT'S A VIOLATION OF THE CONTRACT THAT THE DOCTOR HAD WITH THE COMPANY BECAUSE THE CONTRACT SAYS IT HAS THE RIGHT TO DEFEND—THAT MEANS IT CAN GO TO TRIAL IF IT WANTS TO, WHETHER THE DOCTOR WANTS TO GO TO TRIAL, OR NOT. AND IT ALSO SAYS THE DOCTOR WILL NOT ENTER ANY SETTLEMENT AGREEMENT UNLESS I, THE COMPANY, AGREE TO IT FIRST.

NOW, MR. SLENKER'S POSITION IS THAT I DIDN'T HAVE ANY DUTY TO THE INSURANCE COMMISSIONER TO NOT ASSIST MY CLIENT, DR. DAVOUDLARIAN, IN VIOLATING HIS CONTRACT UNDER THE INSURANCE POLICY. I SAY HE DID HAVE A DUTY BECAUSE THE COMMISSIONER WAS HIS CLIENT. HIS DUTY WAS NOT TO GET MIXED UP IN IT, JUST LIKE HE SAYS HE TOLD MR. MCCOLLISTER.

SO, FOR ALL OF THOSE REASONS AND MORE, I CONCLUDE THAT IF THIS CASE WERE PRESENTED TO YOU, YOU COULD NOT, AND I WOULD NOT LET STAND, A JUDGMENT IN FAVOR OF THE DEFENDANTS IN THIS CASE.

I WANTED YOU TO KNOW WHY I'M DOING WHAT I'M DOING SO YOU WILL PERHAPS UNDERSTAND WHY I'M DOING WHAT I'M DOING.

I WILL AGREE THAT THE CASE WASN'T VERY WELL PRESENTED TO YOU. I GOT ON THE COMMISSIONER'S LAWYER SEVERAL TIMES, BUT HE GOT ENOUGH IN THIS RECORD TO, I THINK, DEMONSTRATE WHAT I HAVE TALKED ABOUT. SO, IT'S UNDISPUTABLE.

FOR THOSE REASONS, JUDGMENT WILL BE RENDERED AS I HAVE OUTLINED. I THANK YOU FOR YOUR PARTICIPATION AND YOUR ATTENTION AND YOUR PROMPTNESS. I HOPE YOU HAVE LEARNED SOMETHING ABOUT OUR JUDICIAL SYSTEM, HOPE YOU HAVE LEARNED SOMETHING FROM THE EXPERIENCE OF SERVING ON A JURY. WE THANK YOU FOR BEING HERE. ON BEHALF OF ALL OF THE PARTICIPANTS WHO ARE HERE TODAY, I THANK YOU AGAIN.

WITH THAT, YOU ARE EXCUSED AND FREE TO GO, AND YOU CAN TALK ABOUT IT TO ANYBODY, IF YOU WANT TO TALK ABOUT IT.

ALL RIGHT, MARSHAL, SHOW THEM OUT. (JURY EXCUSED)

THE COURT: OKAY, THAT WILL BE MY REASONS FOR JUDGMENT FOR THE TIME BEING. COURT WILL BE IN RECESS. (COURT ADJOURNED AT 11:05 A.M.)